No. 2--06--0319     Filed:  11-20-07

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Kane County. |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 94--CF--76 |
| | ) | |
| LAVELLE L. DAVIS, | ) | Honorable |
| | ) | Timothy Q. Sheldon, |
| Defendant-Appellee. | ) | Judge, Presiding. |

JUSTICE BYRNE delivered the opinion of the court:

A jury found defendant, Lavelle L. Davis, guilty of first-degree murder while attempting to commit an armed robbery (felony murder) (720 ILCS 5/9--1(a)(3) (West 1992)), attempted armed robbery (720 ILCS 5/8--4, 18--2(a) (West 1992)), and armed violence (720 ILCS 5/33A--2 (West 1992)).  On direct appeal, we vacated the convictions of attempted armed robbery and armed violence, but we affirmed the conviction of felony murder and the 45-year prison term imposed for it.  People v. Davis, 304 Ill. App. 3d 427, 443 (1999).

Defendant petitioned for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122--1 et seq. (West 2006)), alleging that his trial counsel, Lebert Bastianoni, was ineffective for committing several alleged errors. Following an evidentiary hearing, the postconviction court granted the petition and awarded defendant a new trial.  The State appeals, arguing that (1) defendant's claim of ineffective assistance was or could have been addressed on direct appeal and, therefore, defendant's

claim is barred by the doctrines of waiver and res judicata, and (2) even if the claim is not so barred, it lacks merit.

In granting postconviction relief, the court heard defendant's claim despite finding that it was procedurally barred. We hold that fundamental fairness warrants relaxation of the rules of waiver and res judicata and that the court's evidentiary findings and ultimate decision on the petition are not manifestly erroneous. We affirm the order granting postconviction relief.

FACTS

On December 18, 1993, Patrick "Pall Mall" Furgeson (Pall Mall) was shot and killed outside the Burnham Mill apartment complex (the Mill) in Elgin during an apparent robbery attempt. According to Dr. Joseph Cogan, the forensic pathologist who performed the autopsy, Pall Mall died from a gunshot wound to the abdomen, and he exhibited an injury to the back of the head, caused by blunt-force trauma. Approximately an hour after the shooting, Elgin police officer Michael Gough arrived at the Mill, where he collected a 12-gauge "sawed-off" shotgun with a spent cartridge in the magazine, a pair of black nylon hose, a pair of work gloves, and a roll of duct tape. Gough believed that the items had been placed there recently because they were dry and the ground was wet.

Defendant, Raymond Mims (Raymond), and Kari Brown, otherwise known as Major Julius Hill (Major), were charged and tried in separate proceedings. The State's theory of the case was that the three men borrowed a car in which they waited for Pall Mall to arrive at the apartment where Raymond lived with his girlfriend, Sharlet Clements. Pall Mall arrived at the apartment and told Clements that he was responding to a page from Major. According to the State, Pall Mall left the apartment and walked around the side of the building, where he ran into defendant and Raymond, who were wearing masks. Allegedly, defendant told Pall Mall that the encounter was a "stick up,"

and defendant struck him in the back of the head with the shotgun. Raymond choked Pall Mall from behind and the shotgun went off when it was pointed at Pall Mall's stomach.

The State did not produce physical evidence linking defendant to the shotgun, the hose, or the work gloves that were discovered at the scene. However, over defense counsel's objection, the State introduced testimony that lip prints found on the duct tape matched defendant. The State also attempted to show that Clements witnessed the crime and could identify defendant as the shooter. In October 1996, Clements' inconsistent statements and equivocal testimony led to a mistrial.

During a second trial, Clements identified defendant as the shooter. The jury found defendant guilty of felony murder (720 ILCS 5/9--1(a)(3) (West 1992)), attempted armed robbery (720 ILCS 5/8--4, 18--2(a) (West 1992)), and armed violence (720 ILCS 5/33A--2 (West 1992)). On July 25, 1997, the trial court imposed a 45-year prison term for the felony murder and two concurrent 10-year prison terms for the attempted armed robbery and armed violence convictions.

Defendant filed a direct appeal and presented several arguments in support of reversing the convictions. We set forth those claims in detail because the parties now dispute whether this court's rejection of some of those arguments bars defendant's postconviction petition. On direct appeal, defendant first argued that "[b]ecause lip print identification has not been determined by any other court to be scientifically reliable under the Frye standard [Frye v. United States, 293 F. 1013 (D.C. Cir. 1923)], and because the identification method was not reliable in this case, the trial court erred by allowing such testimony to be admitted." Second, he argued that "[w]here the only physical evidence to link [defendant] to this offense was unreliable lip print identification from a roll of duct tape found near the scene, and the State's only other evidence came from an incredible 'eyewitness' who gave multiple statements and committed perjury, the defendant was not proven guilty beyond

a reasonable doubt." Third, he argued that "[t]rial counsel's lack of preparation, failure to attend multiple court hearings, failure to cross-examine, and failure to ask for a Frye hearing with respect to the lip print evidence rendered him ineffective and substantially prejudiced the outcome of this case." Finally, defendant argued that his convictions of attempted armed robbery and armed violence violated the one-act, one-crime rule. On May 12, 1999, we vacated the convictions of attempted armed robbery and armed violence on one-act, one-crime grounds, but we rejected the other arguments and otherwise affirmed the judgment. Davis, 304 Ill. App. 3d at 443.

On April 5, 2000, defendant petitioned for relief under the Act. Defendant argued that his federal and state constitutional rights to due process, a fair trial, and effective assistance of counsel were violated. First, defendant alleged that trial counsel was ineffective for failing to "investigate and properly prepare this case for trial." Second, defendant alleged that counsel failed to communicate with him adequately. Third, defendant alleged that counsel's ill health prevented him from presenting an adequate defense. Fourth, defendant alleged that counsel failed to challenge the State's lip-print evidence adequately. Fifth, defendant alleged that "trial counsel failed to locate any expert who could testify for the defense regarding the unreliability of lip print evidence." Defendant supported this allegation with the affidavits of Andre Moenssens, James Starrs, and Dee Wayne Heil, forensic scientists who would have testified that there is no recognized forensic discipline that deals with identifying an individual by his lip prints and, therefore, lip-print identification is unreliable. Sixth, defendant alleged that trial counsel was ineffective for failing to investigate his alibi that he was in Chicago at the time of the offense. In support, defendant attached the affidavits of Fred Ellis, Marcus Mathis, Helen Williams, and Korey Bowen, who would have testified to defendant's whereabouts on the date of the shooting. Seventh, defendant alleged that trial counsel should have impeached

Clements, the State's main identification witness, with two letters she had written and her plea agreement. Defendant attached the letters, in which Clements admitted to Raymond that her identification of Raymond as one of the attackers was untrue. Defendant also attached the plea agreement, in which Clements agreed to testify consistently with her statement to police in exchange for the dismissal of a felony charge.

On June 6, 2005, the postconviction court addressed the State's motion seeking to limit the postconviction issues to be considered. The court stated that three of defendant's arguments were barred by res judicata and the remaining four were barred by waiver. Specifically, the court stated that the assertions focusing on counsel's ill health, his failure to attack the use of the lip-print evidence, and his failure to properly impeach the State's main witness were all previously decided and res judicata. The court also stated that the assertions focusing on counsel's failure to investigate and properly prepare the case for trial, communicate with defendant, call experts, and call additional alibi witnesses could have been addressed but were not.

The court correctly noted that the postconviction petition could not be dismissed summarily because it was not heard within 90 days of its filing. See 725 ILCS 5/122--2.1 (West 2006). The court initially scheduled a hearing on the postconviction claims of ineffective assistance that had been allegedly waived. However, before the hearing, defendant moved the court also to consider the issues that allegedly were barred by res judicata. The court granted the motion and ruled that all of the "sub-issues" of the ineffective assistance claim would be heard.

On November 9, 2005, the trial court heard the petition. Because the evidence that defendant introduced was intended to rebut the evidence that the State had introduced at trial, we summarize the State's trial evidence here. Leanne Gray, an Illinois State Police lab forensic scientist, testified

that she specializes in latent print examination. She examined the roll of duct tape discovered at the scene and found an upper and lower lip print on the first six to eight inches of the tape's sticky side. Gray photographed the impression to preserve it. She testified that lip prints, like fingerprints and other impression evidence, are unique and can be used to positively identify someone. Gray took standards of defendant's lips using the sticky side of duct tape and lipstick on paper. Gray performed a side-by-side comparison of the standards and the photograph for about a month and a half, focusing on the lower part of the lower lip. She could not determine whether defendant made the impression found on the tape. Outside the presence of the jury, Bastianoni questioned Gray about her qualifications and the reliability of lip-print identification. Bastianoni was not present when Gray collected defendant's lip prints.

Gray mailed the photograph and the standards to Steven McKasson of the Southern Illinois forensic science lab in Carbondale. Gray then met with McKasson in Carbondale, where they conducted additional comparisons and concluded that defendant was the source of the lip print. McKasson, a document examiner, was also permitted to testify as an expert after questioning outside the presence of the jury. He testified that lip prints are unique and that lip-print comparison is an accepted form of identification. After comparing the lip prints, McKasson found at least 13 points of similarity between a standard and the photograph. He admitted that part of the latent print on the duct tape was not suitable for comparison. However, McKasson concluded that the person who gave the standards also left the duct-tape print. The lip-print identification testimony of Gray and McKasson was the only physical evidence linking defendant to the murder.

At the hearing on the petition, defendant introduced the testimony of Andre Moenssens and Michael Sinke, who are experts in fingerprint identification. Moenssens, who had testified as a

fingerprint expert in 40 to 50 other trials, stated that fingerprint identifications are accurate, reliable, and accepted in the forensic community as well as state and federal courts. However, Moenssens opined that lip-print identification is not recognized as an accepted science, and his research had disclosed no scientific studies that had conclusively established the accuracy and reliability of lip-print identification. He further stated that there are no accepted practices within the forensic science community regarding the methodology for performing lip-print identifications, and he was aware of no appellate court decisions in which lip prints were accepted as accurate or reliable. Moenssens disagreed with McKasson, who concluded that lip prints are unique and comparable like fingerprints. Moenssens believed that McKasson lacked the education, training, and experience to conclude that lip prints are unique. Concluding that lip-print comparison is not an accepted method of scientific identification, Moenssens explained that there are no publications in journals or books, no methodology, no training programs, no certifications, and no articles of acceptance to support the position that lip-print identification is accepted. Moenssens also disagreed with Gray's position that lip-print comparison is a known and accepted form of scientific comparison and that the Federal Bureau of Investigation (FBI) believes it is a positive form of identification. Moenssens was unaware of any official FBI statement endorsing lip-print comparison for identification. In fact, the postconviction court admitted a letter from the FBI latent print unit stating that "the FBI Laboratory has not conducted any validation studies of lip print identification and has determined that it will not perform lip print analysis." Moenssens rejected Gray's theory that ridges on fingers are the same as creases on lips. He concluded that McKasson could not declare lip-print identification reliable to a reasonable degree of scientific certainty because there is no database containing a significant number of lip prints that have been compared and there is no methodology in the field to follow.

Sinke testified that he had worked with the Michigan State Police for 25 years and was a provisional member of the American Academy of Forensic Sciences. He had compared hundreds of thousands of individual fingerprints and palm prints to latent prints. Sinke had testified as an expert approximately 250 times in state, federal, and arbitration courts. Here, Sinke compared the standards to the photograph and concluded that one could not say to a degree of forensic certainty that the questioned lip print and the known lip print were made by the same person. Sinke concluded that the prints could not be matched because he found a discrepancy between the questioned print and the known print. Sinke disagreed with Gray's belief that lip prints and fingerprints are similar in that both can be used in side-by-side comparison identifications. Sinke also opined that McKasson's identification comparison analysis was outdated.

Bastianoni testified by video-recorded deposition. He stated that, at the time of the deposition, he did not possess defendant's file because he had discarded it. Bastianoni is a sole practitioner who specializes in criminal defense and works out of his house. Bastianoni's wife acts as his secretary, but she also has a full-time job elsewhere. Bastianoni has Parkinson's Disease and is on the verge of retirement. He suffered a heart attack in 1983, had a pacemaker and three stints implanted, and had three angioplasties. Bastianoni takes 9 to 12 pills a day.

Bastianoni did not recall when defendant's family hired him, but he believed that he charged a flat fee of $10,000. He recalled missing court dates and requesting continuances in defendant's case because he was sick or tending to other cases in other courtrooms. At the time of defendant's trial, Bastianoni was under a doctor's care for severe stress and dangerously high blood pressure. Bastianoni recalled that the lip-print evidence was the only physical evidence against defendant, and his trial strategy was to attempt to exclude the State's expert testimony or at least undermine its

credibility. Bastianoni also recalled that the lip-print evidence was mentioned 39 times during the opening statement and the closing argument. Bastianoni concluded that the outcome of the trial might have been different if the lip-print evidence had been excluded.

Bastianoni recalled that, during discovery, he informed the trial court and the public defender's office that he needed an expert to rebut the State's lip-print evidence, but neither gave him a name of an expert he could retain. He told defendant's family that an expert would cost more money, but the family said they could not afford it. Bastianoni did not investigate the cost of hiring an expert or attempt to establish defendant's indigence in the trial court. He could not recall whether he discussed with defendant the possibility of hiring an expert. Bastianoni believed that, at the time of the trial, a reasonable, good-faith argument existed over whether lip-print evidence was a reliable means of identification.

Jeffrey Urdangen, a law professor at Northwestern University Law School, was qualified as an expert in the field of criminal defense representation. Upon reviewing the case, Urdangen concluded that Bastianoni did not meet the prevailing norms of professional competence in representing defendant. Specifically, Urdangen opined that Bastianoni was deficient in handling the admissibility of the lip-print evidence because expert testimony for the defense was indispensable. The other evidence was ambiguous, conflicting, and uncertain. Urdangen opined that Bastianoni fell below the prevailing professional norms when he failed to seek out an expert consultant who would work for a lesser fee and failed to establish defendant's indigence and ask the trial court to appoint an expert. Furthermore, Bastianoni should have hired an investigator, inspected the crime scene, and looked into the background of the prosecution's witnesses. Urdangen felt that Bastianoni's representation reflected indifference because he had no one to help him in a complex murder case.

On March 7, 2006, the postconviction court entered a 22-page order granting defendant's petition. The court found that Bastianoni's representation was deficient and that the cumulative effect of his errors was prejudicial. The court credited defendant's arguments that (1) Bastianoni was extremely ill leading up to and during trial, (2) Bastianoni did not have sufficient resources to retain an expert, (3) Bastianoni needlessly abandoned any effort in finding an expert, (4) Bastianoni's errors pertaining to bias and inconsistent eyewitness testimony affected the outcome of the trial, (5) Bastianoni's errors pertaining to the lack of physical evidence linking defendant to the crime affected the outcome of the trial, (6) but for the errors pertaining to the emphasis on the lip-print evidence, the result of the trial would have been different, and (7) defendant's alibi defense was completely undermined when Bastianoni failed to challenge the lip-print evidence. The postconviction court vacated the felony murder conviction and ordered that defendant be remanded to the sheriff of Kane County for further proceedings. The State timely appeals.

ANALYSIS

In this appeal, the State argues that (1) the trial court erred in denying the State's motion to dismiss the postconviction petition because the claims were barred by waiver and res judicata, and (2) even if the proceedings on the petition had properly advanced to stage three, the trial court erred in granting relief, because defendant failed to establish that he had been denied the effective assistance of counsel. Thus, the State concludes, we must reverse the order granting the petition.

Defendant essentially concedes that any issues raised for the first time in the petition are waived. However, he contends that res judicata does not bar his ineffective assistance claim, because his direct appeal was decided on a limited record devoid of any evidence that would contradict the opinions of McKasson and Gray that lip-print identification is accepted and reliable. Defendant then

argues that the trial court's decision to grant the petition was supported by the evidence he presented at the hearing.

"To be entitled to postconviction relief, a defendant must show that he has suffered a substantial deprivation of his federal or state constitutional rights in the proceedings that produced the conviction or sentence" that he challenges. People v. Pendleton, 223 Ill. 2d 458, 471 (2006). The Act establishes a three-stage process for adjudicating postconviction petitions. 725 ILCS 5/122--1 through 122--8 (West 2006); People v. Williams, 364 Ill. App. 3d 1017, 1022 (2006).

At the first stage, the circuit court must independently review the postconviction petition within 90 days of its filing and determine whether "the petition is frivolous or is patently without merit." 725 ILCS 5/122--2.1(a)(2) (West 2006). If the court determines that the petition is either frivolous or patently without merit, the court must dismiss the petition in a written order. 725 ILCS 5/122--2.1(a)(2) (West 2006). If the circuit court does not dismiss the postconviction petition as frivolous or patently without merit, then the petition advances to the second stage. Counsel is appointed to represent the defendant, if necessary (725 ILCS 5/122--4 (West 2006)), and the State is allowed to file responsive pleadings (725 ILCS 5/122--5 (West 2006)). At this second stage, the circuit court must determine whether the petition and any accompanying documentation make a substantial showing of a constitutional violation. People v. Coleman, 183 Ill. 2d 366, 381 (1998). "In determining whether to grant an evidentiary hearing, all well-pleaded facts in the petition and in accompanying affidavits are taken as true." People v. Orange, 195 Ill. 2d 437, 448 (2001). If no constitutional violation is shown, the petition is dismissed. If, however, a substantial showing of a constitutional violation is set forth, then the petition is advanced to the third stage, where the circuit court conducts an evidentiary hearing. 725 ILCS 5/122--6 (West 2006).

"Throughout the second and third stages of a postconviction proceeding, the defendant bears the burden of making a substantial showing of a constitutional violation." Pendleton, 223 Ill. 2d at 473. When a petition is advanced to the third stage for an evidentiary hearing where fact-finding and credibility determinations are involved, we will not reverse those findings unless they are manifestly erroneous. Pendleton, 223 Ill. 2d at 473. Nevertheless, if the issues presented are based on pure questions of law, we apply a de novo standard of review, unless the judge presiding over the proceedings had some special familiarity with the trial or sentencing of the defendant and that had some bearing on the disposition of the postconviction petition. Pendleton, 223 Ill. 2d at 473.

In this case, the postconviction court did not address the petition within 90 days of its filing. The petition advanced to the second stage of the postconviction proceedings, where the State unsuccessfully moved for its dismissal on the grounds of res judicata and waiver. On appeal, the State argues that the court should have dismissed the petition because the ineffective assistance claim was barred by waiver and res judicata.

Ordinarily, postconviction relief is limited by considerations of waiver and res judicata "to constitutional matters which have not been, and could not have been, previously adjudicated." People v. Winsett, 153 Ill. 2d 335, 346 (1992). "Issues that could have been raised on direct appeal, but were not, and any issues previously decided by a reviewing court *** will not be considered in a post[]conviction proceeding." People v. Simpson, 204 Ill. 2d 536, 546 (2001).

Defendant contends that the postconviction court's denial of the State's motion to dismiss was rendered moot when the court granted defendant an evidentiary hearing. We conclude that the issue is not moot because, following the hearing, the postconviction court was still free to deny relief on the grounds of waiver and res judicata. We further conclude that the issue of the applicability of

waiver and res judicata is a legal one, and therefore, we review it de novo. See Pendleton, 223 Ill. 2d at 473.

Our decision to review the res judicata and waiver issues de novo is further supported by the law governing the first-stage summary dismissal of petitions. A postconviction petition may be summarily dismissed at the first stage of proceedings where the defendant's claims are barred by res judicata and waiver (People v. Blair, 215 Ill. 2d 427, 450 (2005)) and we review de novo any first-stage dismissal of a petition under the Act (People v. Little, 335 Ill. App. 3d 1046, 1051 (2003)). Thus, it follows that the denial of relief on the grounds of res judicata and waiver should be reviewed de novo.

Defendant suggests that his postconviction claim as to the lip-print identification is novel, but we conclude that this issue was previously considered and decided on direct appeal. One of the arguments defendant raised on direct appeal was that "trial counsel's lack of preparation, failure to attend multiple court hearings, failure to cross-examine, and failure to ask for a Frye hearing with respect to the lip print evidence rendered him ineffective and substantially prejudiced the outcome of the case." The alleged ineffectiveness of Bastianoni in challenging the admissibility of the lip-print identification is precisely the allegation on which the postconviction court granted relief under the Act.

Because this claim was previously considered and decided on direct appeal, it ordinarily would be barred by the doctrine of res judicata. See Blair, 215 Ill. 2d at 443-44. However, defendant argues that fundamental fairness dictates that res judicata not bar consideration of his claim. Indeed, "the doctrines of res judicata and waiver are relaxed in three situations: where fundamental fairness so requires; where the alleged waiver stems from a claim of ineffective assistance of appellate counsel;

or where the facts relating to the postconviction claim do not appear on the face of the original record." People v. Hanks, 335 Ill. App. 3d 894, 900 (2002), citing People v. Mahaffey, 194 Ill. 2d 154, 171 (2000). We conclude that res judicata must be relaxed in this case.

Here, the evidence was closely balanced and involved inconsistent statements of eyewitnesses. Thus, defendant's conviction largely rested on potentially unreliable forensic identification methodology. Although we deemed that methodology reliable, we agree with defendant that the record available to this court on direct appeal was incomplete because it was devoid of the evidence he introduced at the evidentiary hearing on the petition. In fact, on direct appeal we observed that the trial court considered "the witnesses' uncontroverted testimony" when it found the lip-print identification to be admissible. Davis, 304 Ill. App. 3d at 437. We then stated that "without any evidence offered by defendant to the contrary, we find that the method employed to identify lip prints, a side-by-side comparison, is reliable." (Emphasis added.) Davis, 304 Ill. App. 3d at 437. However, the State's witnesses were uncontroverted at trial because Bastianoni did not introduce the testimony of Moenssens and Sinke, and we affirmed the trial court's admission of the lip-print identification only because defendant was not free to introduce such evidence on direct appeal as he is under the Act. Thus, our rejection of defendant's ineffective assistance claim on direct appeal can be reconciled easily with our current decision to relax the rule barring postconviction claims that were already litigated.

Next we turn to the State's argument that the postconviction court erred in granting the petition. The postconviction court granted defendant relief on his claim that Bastianoni was ineffective at trial. In determining whether a defendant was denied the effective assistance of counsel, we apply the familiar two-prong test set forth in Strickland v. Washington, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984), and adopted by People v. Albanese, 104 Ill. 2d 504 (1984). To

prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant. Strickland, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. More specifically, the defendant must demonstrate that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. A reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome of the proceeding. Strickland, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068. The failure to satisfy either prong of the Strickland test precludes a finding of ineffective assistance of counsel. Strickland, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

The postconviction court held that Bastianoni's failure to investigate the possibility of retaining an expert witness to challenge the admission of the State's lip-print identification evidence completely undermined defendant's alibi defense. The court found that Bastianoni's representation was objectively unreasonable under prevailing professional norms and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Because the petition advanced to the third stage for an evidentiary hearing where fact-finding and credibility determinations were involved, we defer to the postconviction court and conclude that its findings are not manifestly erroneous. See Pendleton, 223 Ill. 2d at 473.

The postconviction court held that trial counsel's representation was deficient. Specifically, the court found that, before trial, Bastianoni was extremely ill, depressed, overwhelmed, and overworked. The doctor treating Bastianoni ordered him to curtail his court schedule to establish

a safe mental and physical state. Furthermore, any expert witness fees paid from the $10,000 retainer would diminish his attorney fees, and Bastianoni lacked the resources to absorb the additional cost. Bastianoni made no effort to investigate the availability of an expert witness or prepare for cross-examination of the State's witnesses by consulting relevant literature. Urdangen testified that Bastianoni's conduct fell well below an objective standard of professional reasonableness.

Furthermore, the postconviction court found that trial counsel's failure to more vigorously challenge the lip-print identification undermined confidence in the outcome of the proceeding. As the postconviction court observed, the State's witnesses were "woefully inconsistent and contradictory and incredible." The court also noted that "[n]one of the physical evidence found at the scene of the crime could be linked to [defendant] except the lip print on the duct tape roll found at the scene of the crime." (Emphasis in original.) Thus, the State highlighted the lip-print identification throughout the trial. However, the experts defendant introduced at the postconviction hearing rebutted the State's experts who claimed that lip-print identification is reliable, readily accepted in the forensic community, and used by the FBI. If defendant's postconviction experts had testified at trial, the court found, the lip-print identification likely never would have been shown to the jury, and no physical evidence would have linked defendant to the crime. Instead, the unreliable scientific evidence prevailed over defendant's alibi defense, thereby prejudicing him. The postconviction court agreed with Urdangen's expert opinion that, but for Bastianoni's unprofessional errors, there is a reasonable probability that the result of the trial would have been different. The court's conclusion is not manifestly erroneous.

Finally, we address any double jeopardy concerns created by the possibility of a new trial. The prohibition against double jeopardy forbids a second trial if the evidence was insufficient to prove the

defendant guilty beyond a reasonable doubt in the initial proceeding. People v. Taylor, 76 Ill. 2d 289, 309 (1979); People v. Hampton, 363 Ill. App. 3d 293, 301 (2005). Dispelling any risk of double jeopardy, we conclude that the evidence presented at trial was sufficient to prove defendant guilty beyond a reasonable doubt. At trial, the State presented eyewitness evidence that defendant committed the offense, and the court admitted the lip-print identification evidence to place defendant at the scene of the crime. As we observed in the direct appeal, "the jury chose to believe Clements over the other inconsistent testimony and defendant's alibi witness." Davis, 304 Ill. App. 3d at 440-41. Based on the evidence considered by the jury, we concluded in defendant's first appeal, as we do now, that the evidence supported the conviction. Davis, 304 Ill. App. 3d at 440-41.

CONCLUSION

For the preceding reasons, we affirm the order of the circuit court of Kane County granting defendant postconviction relief.

Affirmed.

GILLERAN JOHNSON and ZENOFF, JJ., concur.